Leslie E. Rickert and Myrtle E. Rickert v. Commissioner.
Rickert v. Commissioner
Docket No. 68438.
United States Tax Court
T.C. Memo 1959-136; 1959 Tax Ct. Memo LEXIS 107; 18 T.C.M. (CCH) 596; T.C.M. (RIA) 59136; June 30, 1959
*107 Leslie E. Rickert, 1345 Colby Avenue, St. Paul, Minn., for the petitioners. James Booher, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined a deficiency in income tax against petitioners for the calendar year 1954 in the amount of $172.28. The questions are (1) whether certain claimed bad debt deductions are allowable and (2) whether an uncollected judgment against a real estate agent was deductible. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Petitioners are husband and wife and reside in St. Paul, Minnesota. They filed a joint income tax return for the taxable year with the district director of internal revenue for the district of Minnesota. On February 14, 1947, Kathryn, the oldest daughter of Leslie Rickert, hereafter referred to as Rickert or petitioner, was married to Alois John Stein, who was usually referred to as Al. She and Al had an undisclosed number of children, the oldest of whom was about seven years old in 1954. Al and Kathryn were separated in 1954 and divorced in February 1955. Because of undisclosed ailments and difficulty in finding *108 work for which he was qualified, Al worked irregularly, particularly from the middle of 1949 to the middle of 1950. Thereafter he was regularly employed with the Police Department of Golden Valley, a suburb of Minneapolis. During their early marriage Al and Kathryn had financial difficulties. From time to time during the years 1949 through 1952, petitioner advanced money to Kathryn to pay for such items as food, rent and insurance premiums. Al requested no money of petitioner and received none. He made no promise to petitioner that he would repay the money advanced to Kathryn. Except for rent paid for two months in 1949, at $21 a month, Al did not know the amounts petitioner advanced to Kathryn. Rickert kept no records of the amounts or dates of the advances, and he had no definite expectation of being repaid. On September 7, 1951, Al was adjudged a bankrupt by the referee in bankruptcy of the United States District Court for the District of Minnesota. He listed three creditors whose aggregate indebtedness totaled $504.17 and whose debts were secured by a mortgage and two sales contracts on assets valued at $385. He also listed 23 claims in the aggregate amount of $1,162.88, which *109 were unsecured. He did not list petitioner as a creditor and petitioner filed no claim with the referee. On November 8, 1951, Al was discharged as a bankrupt. In 1952 or 1953, Al and Kathryn bought a home. It was necessary to put a fence around the yard to prevent the children from running out into the street. The fence was furnished by petitioner and was installed by Al. Al understood his wife to say that petitioner was giving the fence to her. Petitioner's daughter, Mary Lou, was married to Gerald Cloyd on November 29, 1952. Gerald was in the Army at Washington, D. C. Mary Lou was working for the Government at the Pentagon Building. In order to go to Minneapolis to be married, they borrowed $200 from petitioner. Mary Lou repaid the $200 from the money she earned. During 1953, Gerald was to be discharged from the service and he and Mary Lou, with their small baby, were planning to move to Minneapolis around the first of September. Mary Lou needed $100 for plane fare for herself and baby. She had Gerald call petitioner and ask him to send the money by telegram. When Mary Lou arrived in Minneapolis, she told her father that she and Gerald would repay the $100 when Gerald was discharged *110 from the service. When Gerald arrived in Minneapolis the latter part of September or the first of October 1953, petitioner advanced Gerald some money. Mary Lou did not know about this advance until later when her father told her about it. In November 1953, Mary Lou asked her father to co-sign a note with Gerald. She understood that Gerald had a ninety-day note for $300 in an Iowa bank that was due, and they owed bills that amounted to $50. Gerald and petitioner signed a note for $372 on November 3, 1953, at the Midland National Bank of Minneapolis, where petitioner transacted his banking business. On the face of the note the $372 was shown to consist of two amounts, $350.90 and $21.10. The note was to be paid in 12 monthly payments of $31 each, starting on December 5, 1953. Petitioner understood that Gerald wanted money for buying an automobile and to pay some obligations he owed. Mary Lou got $50 and paid some bills. $100 was used to buy a car. Gerald retained the balance of the note proceeds and made no disclosure as to the purposes for which it was expended. Thereafter but also in November of 1953, Mary Lou and Gerald were separated. On or about November 25, 1953, Gerald *111 left the Minneapolis area, presumably to avoid arrest. On some undisclosed date in 1954, he was apprehended and returned to Minneapolis. On May 31, 1954, the county attorney filed an information in the district court, charging him with the crime of rape, committed on or about November 25, 1953, to which charge upon arraignment, he pleaded not guilty. On June 9, 1954, he withdrew his plea of not guilty and entered a plea of guilty as charged. His sentence to imprisonment in the Minnesota State Reformatory was stayed and he was placed on probation for four years. The first year of probation was to be served in the "City W.H." At some undisclosed date in 1954, petitioner wrote Gerald's father, R. L. Cloyd, at Tabor, Iowa, and suggested that Cloyd pay petitioner the money Gerald owed him. On July 4, 1954, Cloyd wrote to petitioner that as to "paying that note" he was unable to do so; that he had paid the note that Gerald had made at the local bank and that "Gerald will pay back what he owes you when he gets out and gets to work." Petitioner made all of the payments on the note he had signed with Gerald, the last two payments being made on November 18, 1954, at which time he received *112 the canceled note. In the summer of 1955, after Gerald had been released from custody and placed on parole, petitioner advised the probation officer that Gerald owed him a sum of money, requested assistance to secure repayment and threatened legal action against Gerald if no payments were made. Gerald disputed the total sum claimed but admitted owing $350, which he agreed to pay. It was arranged for the payments to be made through the probation department so as to avoid any disputes later with regard thereto. The department forwarded to petitioner payments as follows: Period of
Number of
Total of
Year
Payments
Payments
Payments
1955
From July 28 through
December 8
8
$ 55
1956
From Jan. 4 through
December 17
19
180
1957
From Jan. 4 through
April 29
6
50 $285
The department received and made no further payments, its case on Gerald having been closed on May 9, 1957. On July 22, 1957, the probation officer advised petitioner that Gerald had been dismissed from probation and was no longer under his supervision, suggesting that petitioner "contact him directly at 1917 1/2 Sixth St. South in Minneapolis." Petitioner went to that *113 address and learned that Gerald had moved and had left no forwarding address. In 1958 the probation officer's last information on Gerald was that he resided in Graettinger, Iowa. In 1953, petitioner bought a home through Andrew Reardon, a real estate agent, who represented the seller. In looking over the property, petitioner saw a power mower and was assured by Reardon that the mower would go with the property if petitioner purchased it. When petitioner later purchased and took possession of the property the mower was missing. Petitioner could get no satisfaction out of Reardon, who denied that he had made such a representation with respect to the mower. Petitioner sued Reardon and on or about May 14, 1954, obtained a judgment against him for $76. Petitioner learned through the local newspaper that on or about July 8, 1954, Reardon was sentenced in a local court to serve up to 10 years in the state penitentiary on a first-degree grand larceny charge. In June Reardon had been found guilty by a jury of having withheld some $2,000 from a client whom he had represented in a property transaction. Petitioner obtained information that Reardon had transferred all property of which petitioner *114 knew about to persons in his own family and petitioner was unable to collect on the judgment. On their 1953 return, filed March 22, 1954, petitioners claimed a deduction for "Bad Debt - Gerald Cloyd $610.00." On their 1954 return, filed April 15, 1955, petitioners claimed bad debt deductions, as follows: Andrew Reardon
$ 75.50
Mr. and Mrs. Al Stein
614.43
On October 25, 1956, petitioners filed an amended return for 1954 and a claim for refund, also for 1954. Part of the claim for refund was based on a claim of a bad debt deduction for 1954 covering a $600 claim against Gerald Cloyd. Petitioner shows on the face of the 1954 amended return that the adjusted gross income of $9,895.44, as reported on the original return, was reduced $1,100 to $8,795.44. Of the $1,100, $600 was a claimed bad debt of Gerald Cloyd and was the same debt which had been claimed at $610 on the 1953 return. [1]
In his determination of deficiency the respondent disallowed both the deduction of the claimed bad debt of Al Stein in the amount of $614.43 *115 and the $75.50 representing the unsatisfied judgment for that amount against Reardon. He also denied the claim for refund which had been based on the 1954 amended return. Opinion It is claimed that the moneys advanced by petitioner to his daughter Kathryn were loans to her and her husband, Al Stein, and created a debt of $614.43, the amount claimed as a bad debt deduction on the 1954 return. It is argued that the advances were made as loans in various amounts over a period of time during which Kathryn and Al were having financial difficulties and were in need of help in order to meet necessary living expenses. No records were kept and consequently no definite dates are shown on which the advances were made, nor are any specific amounts shown. The aggregate amount purports to cover advances made during "1949 through 1952" but the money advanced in any one year is not shown. Most of the advances appear to have been made in the earlier years and it was in 1951 that Al was declared a bankrupt after which according to Rickert's testimony he did not consider Al as being legally obligated to him. On the record we are satisfied that no creditor-debtor relationship was intended or existed *116 between petitioner and his daughter and son-in-law. None of the advances was discussed with or made to Al. In addition to the fact that no records were kept of dates and amounts, petitioner had no agreement or understanding that the amounts were definitely to be repaid and never made any demand for payment. Al recognized no indebtedness and understood as late as 1952, when he and Kathryn acquired a home, that the fence furnished by petitioner for enclosing the yard was a gift by petitioner to Kathryn. Also, petitioner testified that at the times he made the advances he had no intention of enforcing payment and had no definite expectation of receiving payment. Under the evidence offered, the moneys advanced by petitioner to his daughter Kathryn appear to have been more in the nature of gifts than debts. Petitioner contends that after Al was discharged as a bankrupt there was a moral obligation on Al's part to repay him and that he had hoped when Al obtained regular work he and Kathryn would make an effort to reimburse him, but that hope was lost when Al and Kathryn separated in 1954. However that may have been, there was no established indebtedness in existence in 1954 and a moral *117 obligation alone, even if one existed, does not supply a basis for a bad debt deduction. In order to support petitioner's claim that Al recognized the indebtedness to petitioner, petitioner introduced a statement which on its face appears to show such recognition. It appears that the statement was prepared by petitioner for his daughter to sign in May 1956, at which time his tax liability for 1954 was being investigated by an internal revenue agent. The purpose was to show justification for claiming the bad debt deduction in question. After Kathryn signed the statement, Al's signature was obtained beneath her signature and under an additional sentence which is, "The above statements are correct." Al's testimony was to the effect that he signed the statement in order to help petitioner with his tax matter, that he understood the statement included money advanced to Kathryn prior to her marriage; that several bills were in petitioner's name and not Al's, and that at the time he signed the statement there was no amount given. There is a sentence above Kathryn's signature which states that "(The) money borrowed amounted to $700.00" and it could be that it was inserted after the original *118 statement had been prepared and signed. No rebuttal to Al's testimony was offered and though Kathryn was in the courtroom she was not called as a witness. There is no showing that petitioner endeavored to collect from Al either prior to or after the statement was signed. From 1952 until the date of hearing herein, Al was regularly employed as a member of the Police Department of Golden Valley, and had petitioner thought that Al was indebted to him, if only on a moral obligation, we are of the belief that he would have been as persistent in enforcing payment as he was with his other son-in-law, Gerald Cloyd, and the real estate salesman, Andrew Reardon. Petitioner has failed to prove that the indebtedness of $614.43, if it was in existence, became worthless in the year 1954. The second bad debt deduction claimed by petitioner relates to moneys paid by petitioner to or on behalf of his daughter, Mary Lou, and her husband, Gerald Cloyd, the aggregate amount claimed being $600. The $600 claimed appears to include $100 advanced for Mary Lou's airplane ticket; $90 claimed by petitioner to have been advanced to Gerald, (although Mary Lou understood the amount to be $50); and $372, the *119 principal and interest paid by petitioner on the note co-signed by petitioner in helping Gerald to borrow the money. The balance of either $38 or $78 is not accounted for. Petitioner has not shown that he made the advances to either Mary Lou or Gerald with any intention of enforcing payment or with an expectation of being repaid, and we are unable to conclude that a debtorcreditor relationship has been established with respect thereto. We are of the opinion, however, that the bank loan was a different kind of transaction, although respondent argues that in substance the payment of the loan is similar to the other advances petitioner paid to both of his daughters and their husbands. Gerald represented to petitioner that he needed the money to pay on a note he had made in Iowa, to buy a car and to pay a few bills. To obtain the loan it was necessary for petitioner to sign Gerald's note, which he did. It was arranged that the principal and interest in the aggregate amount of $372 could be paid in 12 monthly payments of $31 each. At the time, petitioner fully expected Gerald to make the payments. When Gerald got into trouble, for which he was later imprisoned, and had made no payments, *120 petitioner was called on to make them and when he had paid the note in full in November 1954, he had an existing debt against Gerald and a legal right to claim payment from him. At that time, however, Gerald had not only shown that he was unreliable but he was serving time for having committed a criminal offense. The offense was committed in November 1953 and caused him to flee the community and could have been the cause of the separation of Mary Lou from Gerald. It is understandable why petitioner considered the indebtedness uncollectible and worthless, and we think he was justified in claiming the bad debt deduction for 1954 when, by reason of petitioner's payment of the note, the debt arose. The fact that Gerald made payments to petitioner after being released from custody does not alter the fact that the indebtedness was worthless in 1954. When the payments were made in 1955, 1956 and 1957, Gerald was subject to some supervision from the parole office and there is no reason to conclude they were voluntarily made or could have been anticipated in 1954, since as soon as he was released from parole he not only quit making payments but left the community. We conclude that petitioner *121 is entitled to a bad debt deduction for 1954 in the amount of $372. The years in which the collections through the parole office were made are not before us. The third deduction claimed by petitioner is in the amount of $75.50 and relates to the judgment obtained against Andrew Reardon in 1954, during which year it is contended the judgment became uncollectible. Just what the action against Reardon was is not shown, but apparently it was based on his false representation, it being petitioner's testimony that Reardon denied making the representation and he, petitioner, could get no satisfaction out of him. Petitioner has not shown that any part of his payment made in purchase of the house was in payment for the lawn mower or that he made any outlay for the lawn mower to Reardon or anyone else. Neither are we advised as to the basis for the judgment. In so far as appears, it may have been punitive only, in which case he could not have had a bad debt loss for something he never had in the first place. Such being the state of the record, petitioners have not shown they are entitled to the deduction claimed. Decision will be entered under Rule 50. Footnotes
1. Although not definitely shown by the evidence, there is some testimony indicating that the 1953 deduction had been disallowed.↩